**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

LORI W. WILL
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

August 11, 2026

Blake A. Bennett, Esquire
Cooch and Taylor, P.A.
1000 North West Street, Suite 1500
Wilmington, Delaware 19801

Brian M. Rostocki, Esquire
John T. Miraglia, Esquire
Reed Smith LLP
1201 North Market Street, Suite 1500
Wilmington, Delaware 19801

Ryan M. Ernst, Esquire
Bielli & Klauder, LLC
1204 North King Street
Wilmington, Delaware 19801

Seth D. Rigrodsky, Esquire
Herbert W. Mondros, Esquire
Rigrodsky Law, P.A.
1007 North Orange Street, Suite 453
Wilmington, Delaware 19801

> RE: *In re The Beauty Health Company Consolidated Stockholder Litigation*, C.A. No. 2024-0114-LWW

Dear Counsel:

This derivative suit challenged the oversight of problems with The Beauty Health Company's HydraFacial Syndeo skincare treatment system. The parties agreed to settle the litigation in exchange for therapeutic benefits, including the formalization of preexisting management committees and the internal designation of a product quality ombudsperson. Because the settlement releases weak claims in exchange for minor enhancements, the consideration is adequate and I approve

it. But I award a significantly reduced attorneys' fee commensurate with the minimal corporate benefit achieved.

## I.     BACKGROUND[1]

Nominal defendant The Beauty Health Company (the "Company") is a publicly traded Delaware corporation that designs and markets skincare treatments—most notably, HydraFacial.[2] HydraFacial is a patented, non-invasive skincare procedure that cleanses, extracts, and hydrates the skin with proprietary serums and solutions.[3]

In March 2022, Beauty Health launched an advanced device called the HydraFacial Syndeo Delivery System.[4] It was expected to "deliver a new, better and different treatment than any other product available" and drive future revenue growth.[5] Syndeo did not live up to expectations. It was plagued by hardware, software, and design defects that caused "customer dissatisfaction."[6] Facials were disrupted mid-treatment so that estheticians could clear blocked lines, and poor fluid

---

[1] Unless otherwise noted, the facts discussed in this decision are based on the allegations in the Verified Stockholder Derivative Complaint. They are untested and no findings of fact are being made.

[2] Verified Consol. Am. S'holder Deriv. Compl. (Dkt. 17) ("Am. Compl.") ¶¶ 16, 46.

[3] *Id.* ¶ 46.

[4] *Id.* ¶¶ 2, 52.

[5] *Id.* ¶ 71.

[6] *Id.* ¶ 70.

delivery and weak suction meant clients did not receive deep exfoliation and serum infusion.

Beauty Health's Board of Directors was apprised of these issues and of remediation efforts throughout late 2022 and early 2023.[7] Meanwhile, management touted strong financial results in Company disclosures and characterized the product malfunctions as "teething issues" during analyst calls.[8]

On November 13, 2023, Beauty Health announced that it was designating all first- and second-generation Syndeo devices as obsolete and offering to replace them at the Company's expense.[9] As a result, Beauty Health incurred over $63 million in combined write-downs and remediation expenses.[10] Upon this announcement, the Company's stock price fell from a two-year high of $13.90 to approximately $1.45 per share.[11] Federal securities litigation followed.[12]

---

[7] *Id.* ¶¶ 63-74.

[8] *Id.* ¶¶ 54, 66, 77-78, 84, 92, 99.

[9] *Id.* ¶ 112; *see also id.* ¶ 7.

[10] *Id.* ¶¶ 7, 112.

[11] *Id.* ¶¶ 9, 114.

[12] *See Abduladhim A. Alghazwi v. The Beauty Health Co.*, Case No. 2:23-cv-09733-MAA (C.D. Cal.).

## A.    The Litigation

After books and records investigations under 8 *Del. C.* § 220, plaintiffs Margie Elstein and Richard Montague filed derivative actions in this court that were consolidated in 2024.[13]  Their operative complaint brought breach of fiduciary duty claims against current and former Beauty Health directors and officers.  The plaintiffs claimed that the individual defendants:

> either knowingly permitted the repeated dissemination of false information about the Company's key product, Syndeo, without disclosing the knowledge of critical software and hardware issues plaguing the machine, conduct implicating and barred under *Massey*, or chose to bury their heads in the sand and not make a decision to avert the knowable and grave risks raised by such false dissemination as prohibited by *Caremark*, in the face of knowable and grave risks raised by such improper conduct and numerous red flags.[14]

The plaintiffs also brought a corporate waste claim regarding a stock repurchase program.

---

[13] *See* Opening Br. in Supp. of Settlement and Approval of Atty's' Fees, Expenses, and Service Awards (Dkt. 51) ("Settlement Br.") 5-6; Stipulation and Order Governing Consolidation, Appointment of Lead and Deadline to Respond to Operative Compl. (Dkt. 15).

[14] Am. Compl. ¶¶ 182, 187; Tr. of May 13, 2026 Settlement Hr'g (Dkt. 62) ("Settlement Hr'g Tr.") 8-12 (describing the claim as a *Caremark* prong one claim "with regard to the board being less involved than [Elstein] thought they should be," a *Caremark* prong two claim concerning "red flags" of product returns and failures, and a so-called "*Massey* claim" based on the Company's public disclosure that it was "on the cusp" of fixing Syndeo's problems when there was "much more to do").

The defendants moved to dismiss the Complaint, arguing that the plaintiffs could not establish demand futility under Court of Chancery Rule 23.1.[15] In May 2025, as briefing on the motion to dismiss was concluding, another stockholder—Monica Stan—sent a litigation demand to Beauty Health concerning the same matters raised in the Complaint.[16]

**B.      The Settlement**

On November 3, 2025, the parties agreed to resolve the litigation.[17] They ultimately filed a revised Stipulation of Settlement on February 9, 2026.[18]

The settlement contemplates the release of derivative claims that were or could have been brought against the defendants regarding the issues asserted in the Complaint in exchange for a package of therapeutic benefits.[19] The Company agreed to: (1) adopt formal charters for three existing management-level committees and require the Chief Operating Officer to meet with them periodically; (2) designate an

---

[15] *See* Defs.' Opening Br. in Supp. of Mot. to Dismiss Verified Consol. Am. Deriv. Compl. or Stay Proceedings (Dkt. 28). Before the opening brief was filed, the defendants had moved to dismiss the Complaint and moved for a briefing schedule over the plaintiffs' objection. *See* Dkts. 19, 22. The plaintiffs cross-moved for a stay of this action in deference to federal securities litigation in California. Dkt. 23. Those motions were withdrawn when the federal suit went to mediation. Dkt. 26.

[16] Stipulation of Settlement (Dkt. 43) ¶ N.

[17] *See id.* ¶ S; Letter from B. Bennett (Dkt. 38).

[18] Dkts. 41-43.

[19] *See* Stipulation of Settlement ¶ 1.8 (defining "Plaintiffs' Released Claims").

existing employee as a "Quality Ombudsman" to report to the Board on product development; (3) provide quarterly inventory and return reports to the Board; (4) amend the Audit Committee charter to explicitly state that it oversees the reasonableness of public financial projections; and (5) expand its compensation clawback policy to cover non-executive officers for reckless misrepresentations or governance violations.[20]

On March 17, the parties agreed to dismiss Montague as a plaintiff because he sold his stock in the Company.[21]

After notice of the settlement was given to stockholders, I held a settlement hearing on May 13, 2026.[22] The plaintiffs' counsel maintained that the settlement "confer[red] substantial benefits on the Company and its stockholders."[23] Counsel also sought an uncontested fee and expense award of $737,500. Elstein and Stan each requested a $2,500 service award. I took these matters under advisement.

## II.   ANALYSIS

The parties seek approval of their settlement. The plaintiffs' counsel further request an award of fees and expenses, and service awards to Elstein and Stan. As

---

[20] Stipulation of Settlement Ex. A.

[21] Dkt. 45.

[22] Dkt. 61.

[23] Settlement Br. 4.

discussed below, I approve the settlement because the release of weak claims is a minor "give" in exchange for an equally minor "get" of therapeutics. I award the plaintiffs' counsel a significantly reduced fee and I decline to grant service awards.

### A. Settlement Approval

Under Court of Chancery Rule 23.1(d), a derivative action may be settled only with the court's approval.[24] I may approve a settlement if it was negotiated at arm's length, the plaintiffs adequately represented the entity, adequate notice was provided, and the relief falls within a range of reasonable results.[25]

The procedural requirements are met. I have no basis to question that Elstein and Montague (while he retained standing) and their counsel adequately represented Beauty Health. The form and manner of court-ordered notice was adequate.[26] And the settlement was negotiated at arm's length before a skilled mediator.[27]

Assessing whether the settlement "falls within a range of reasonable results" is more complicated.[28] Delaware courts frame this inquiry "as evaluating the 'give'

---

[24] Ct. Ch. R. 23.1(d)(1).

[25] Ct. Ch. R. 23.1(d)(5).

[26] *See* Affs. of Notice (Dkts. 53-59).

[27] Settlement Br. 9. I also note that Elstein filed the affidavit required by Rule 23.1(d)(2)(A). Aff. of M. Elstein (Dkt. 51).

[28] Ct. Ch. R. 23.1(d)(5).

and the 'get' of the proposed settlement."[29]  I must weigh the value of the released claims against the settlement consideration, taking into account the strength of the claims, the litigation risks, the scope of the release, and any objections.[30]

       1.     <u>The Released Claims</u>

The value of the released claims (i.e., the "give") is negligible.[31]  To state a *Caremark* claim, a plaintiff must adequately plead that "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations . . . ."[32]  The plaintiffs' own allegations, however, confirmed that the Board was apprised of Syndeo's hardware and software defects and management's ongoing corrective action.[33]  Imperfect compliance is not bad faith.  Nor does a defective product launch—especially one met with active remediation—indicate a conscious dereliction of duty.

---

[29] *In re AMC Ent. Hldgs., Inc. S'holder Litig.*, 2023 WL 5165606, at *19 (Del. Ch. Aug. 11, 2023) (citations omitted), *aff'd*, 319 A.3d 310 (Del. 2024) (TABLE).

[30] *See* Ct. Ch. R. 23.1(d)(5)(D).  There were no objections to the settlement.

[31] *Cf. Polk v. Good*, 507 A.2d 531, 535 (Del. 1986) (explaining that a court reviewing a settlement of a representative action must "consider the nature of the [plaintiff's] claim, the possible defenses thereto, the legal and factual circumstances of the case, and then apply its own business judgment in deciding whether the settlement is reasonable in light of these factors").

[32] *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

[33] *E.g.*, Am. Compl. ¶¶ 43, 74.

The plaintiffs also invoked the most extreme iteration of an oversight claim: affirmative lawbreaking for profit.[34] They alleged that the "dissemination of false information about . . . Syndeo" without disclosing its hardware and software problems implicated conduct "barred under *Massey*."[35] In *Massey*, the court confronted something categorically different: fiduciaries who purposefully caused the corporation to break the law as part of its business strategy, flouting mining safety laws to increase profits at the expense of worker safety.[36] Here, the alleged "lawbreaking for profit" consisted of allowing Beauty Health to report strong earnings while Syndeo was causing bad facials. That is not *Massey*. It is—at most— a theory that the defendants concealed product glitches to avoid the commercial consequences of disclosing them. And even that theory is undercut by the Complaint, which alleges that the Company voluntarily spent tens of millions of dollars to replace defective devices.[37]

---

[34] *See In re TransUnion Deriv. S'holder Litig.*, 324 A.3d 869, 886 (Del. Ch. 2024) (describing the "extreme end of the [*Caremark*] spectrum" as "a claim that directors and officers purposely caused the corporation to break the law in pursuit of greater profits").

[35] Am. Compl. ¶ 187; *see also id.* ¶¶ 30, 182.

[36] *See In re Massey Energy Co.*, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011).

[37] *See* Am. Compl. ¶¶ 7, 112, 115.

The waste claim was equally vulnerable. The Complaint challenged the Board's authorization of a $100 million open-market stock repurchase program.[38] To state a claim for waste, a plaintiff must plead that an exchange of corporate assets was "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration."[39] An open-market stock repurchase executed at prevailing prices falls short of that standard.

Thus, the plaintiffs' potential for ultimate success on the merits was highly improbable. The release is tailored to derivative claims arising from the Syndeo rollout and related disclosures, excluding the pending federal securities action.[40] The Company retains the right to pursue unrelated claims. The "give" is trivial.

### 2. The Settlement Consideration

The "get" is equally underwhelming. The plaintiffs describe the settlement consideration as meaningful for the "direct impact" it will "have on the Board's oversight protocols that [they] believed were deficient" and "led to the product issues with Syndeo."[41] In reality, the proposed terms add up to a "handful of nothing."[42]

---

[38] *See id.* ¶¶ 6, 107, 190-195.

[39] *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000) (citation omitted).

[40] Stipulation of Settlement ¶ 1.8.

[41] Settlement Br. 16.

[42] *Knight v. Miller*, 2023 WL 3750376, at *4 (Del. Ch. June 1, 2023) (borrowing the words of Vice Chancellor Glasscock to describe a weak therapeutic settlement).

The terms either formalize existing practices, are operational enhancements rather than structural improvements, or are unrelated to the harm alleged in the Complaint.

The creation of a "Quality Ombudsman" merely bestows a new title and modest reporting obligations on a current employee.[43]  The adoption of charters for three operating management-level committees, along with the quarterly inventory reporting requirement, largely formalizes existing practices and reporting lines.[44] The amendment to the Audit Committee's charter to explicitly state its oversight of financial projections similarly codifies existing duties.[45]  And expanding the Company's discretionary clawback policy bears no logical connection to the claims alleged.[46]

These incremental reporting and governance enhancements are of minor consequence.  But in the settlement context, the "get" need only be commensurate with the "give."  Because the released claims are exceptionally weak, these terms provide adequate consideration.[47]  The settlement, which spares the Company the

---

[43] Stipulation of Settlement Ex. A ¶ B.1.

[44] *See id.* ¶¶ A, C; *see* Settlement Hr'g Tr. 56 (plaintiffs' counsel acknowledging the Board was already receiving "very granular information" regarding Syndeo return rates).

[45] *See* Stipulation of Settlement ¶ D.

[46] *See id.* ¶ E.

[47] *See Kahn v. Sullivan*, 594 A.2d 48, 63 (Del. 1991) (affirming the Court of Chancery's approval of a settlement where the consideration was "sufficient to support the [s]ettlement and [wa]s adequate, if only barely so, when compared to the weakness of the plaintiffs' claims").

burdens of further litigation, therefore falls within a range of reasonableness.  I approve it as fair, reasonable, and adequate.[48]

## B.     Fee and Expense Award and Service Awards

Counsel for Elstein, Montague, and Stan seek an uncontested, all-in fee and expense award of $737,500.[49]  A plaintiff who "pursues a cause of action relating to the internal affairs of a Delaware corporation and generates benefits for the corporation or its stockholders" may recover an award of attorneys' fees.[50]  In assessing a fee application, Delaware courts apply the *Sugarland* factors: "the benefit achieved, the difficulty and complexity of the litigation, the effort expended, the risk-taking, [and] the standing and ability of counsel."[51]  The benefit achieved is given the greatest weight.[52]  The plaintiffs bear the burden of establishing the value

---

[48] *See Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1285 (Del. 1989) ("[W]here the [Court of Chancery] finds that the plaintiff's potential challenges have little chance of success, [it] has good reason to approve the proposed settlement.").

[49] *See* Stipulation of Settlement ¶ U.

[50] *In re Emerson Radio S'holder Deriv. Litig.*, 2011 WL 1135006, at *2 (Del. Ch. Mar. 28, 2011).

[51] *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1255 (Del. 2012); *see also Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142, 149-50 (Del. 1980).

[52] *See, e.g.*, *In re Cox Radio, Inc. S'holders Litig.*, 2010 WL 1806616, at *20 (Del. Ch. May 6, 2010), *aff'd*, 9 A.3d 475 (Del. 2010) (TABLE).

of any benefit and the reasonableness of their request, the ultimate determination of which rests within the sound discretion of this court.[53]

1.     The Benefit Conferred

"[A] corporation may receive a 'substantial benefit' from a derivative suit . . . regardless of whether the benefit is pecuniary in nature."[54]  Although the therapeutic benefits here are non-pecuniary, the plaintiffs attempt to quantify them in two ways.

First, the plaintiffs contend that if the enhancements they achieved "reduce the likelihood" of the $65.2 million Syndeo-related inventory and remediation write-downs "even by as little as 50% . . . , the value of the benefits achieved by the [s]ettlement could be quantified at approximately $33.6 million."[55]  Assigning an arbitrary 50% success rate to a set of reporting measures and multiplying it by past losses is not financial analysis; it is guesswork.

Second, the plaintiffs assert that "the Company's current $122 million market capitalization could increase by over $24 million" based on a McKinsey & Company

---

[53] *See In re Abercrombie & Fitch Co. S'holders Deriv. Litig.*, 886 A.2d 1271, 1273 (Del. 2005) ("The determination of any award is a matter within the sound judicial discretion of the Court of Chancery." (quoting *In re Infinity Broad. Corp. S'holders Litig.*, 802 A.2d 285, 293 (Del. 2002))); *Korn v. New Castle Cnty.*, 2007 WL 2981939, at *2, *5 (Del. Ch. Oct. 3, 2007).

[54] *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395 (1970).

[55] Settlement Br. 35.

survey regarding the premium investors pay for strong corporate governance.[56] This

argument fares no better. A general macroeconomic survey cannot be used to value

specific, operational-level changes at a single company.

Delaware courts decline to "engage in complicated and highly speculative

intellectual exercises in attempting to quantify" non-quantifiable benefits.[57] Instead,

"if there are precedents on which to base a fee award, . . . then [the] court should

look in the first instance to those precedents."[58] The court may award a fee "based

on quantum meruit principles" if no apt precedent exists or where the benefit is not

quantifiable.[59]

The plaintiffs rely primarily on two precedents: *In re Myriad Genetics, Inc.

Stockholder Derivative Litigation* and *In re Geron Corp. Stockholder Derivative

Litigation*.[60] In *Myriad Genetics*, the court awarded a $950,000 fee after observing

that the settlement added a new independent director and "robust and weighty"

board-level oversight reforms that would "reduce the possibility of the type of

---

[56] *Id.* at 37; *see also id.* at 25, 36.

[57] *La. State Empls.' Ret. Sys. v. Citrix Sys., Inc.*, 2001 WL 1131364, at *9-10 (Del. Ch. Sept. 19, 2001).

[58] *Sciabacucchi v. Salzberg*, 2019 WL 2913272, at *6 (Del. Ch. July 8, 2019).

[59] *Citrix*, 2001 WL 1131364, at *1, *9-10; *see also In re Golden State Bancorp Inc. S'holders Litig.*, 2000 WL 62964, at *3 (Del. Ch. Jan. 7, 2000).

[60] Settlement Br. 23-24.

trauma that ha[d] occurred."[61]  In *Geron*, the court awarded a $1.35 million fee for "excellent" benefits that included amending bylaws to increase the number of independent directors, adding a new independent director, and requiring board-level regulatory reporting.[62]

Unlike in *Myriad Genetics* and *Geron*, the settlement here provides no structural governance changes.  The Company is not amending its bylaws, adding an independent director, or improving its board-level oversight architecture.  It is bestowing a new title on an existing quality control manager, formalizing preexisting management committees and reporting obligations, codifying the Audit Committee's existing duties, and expanding a discretionary clawback policy that has nothing to do with the harm alleged.  These benefits do not warrant a high six-figure fee award.

Instead, this case calls to mind precedent at the other end of the therapeutic settlement spectrum, where the benefits amount to minor improvements in company policy.  In *Schumacher v. Loscalzo*, for example, this court awarded a $50,000 fee to a stockholder who filed duplicative derivative litigation and achieved several

---

[61] C.A. No. 2021-0686-SG, at 5-6 (Del. Ch. Nov. 26, 2024) (TRANSCRIPT).

[62] C.A. No. 2020-0684-SG, at 8-9, 18-20 (Del. Ch. May 17, 2023) (TRANSCRIPT).

proxy "disclosure enhancements."[63]  Those benefits did not "add meaningfully" to what the company was already disclosing or required to disclose.[64]

As in *Schumacher*, the benefits achieved here may "modestly improve on what the company was already doing."[65]  To be sure, the settlement consideration in this case is broader than the relief achieved by the piggyback plaintiff in *Schumacher*, justifying a higher floor.  But because the plaintiffs failed to demonstrate that the benefits do much beyond formalizing the status quo, I set a baseline fee award of $100,000.[66]

### 2.  The Late-Arriving Demand

Having set the baseline fee, I must determine who is entitled to receive it.  The joint fee application seeks to compensate counsel for Elstein, Montague, and Stan.  Elstein's and Montague's counsel may share the fee award.  Stan's counsel, however, is entitled to nothing.

---

[63] 2023 WL 4842103, at *6-7 (Del. Ch. July 28, 2023).

[64] *Id.* (citation omitted).

[65] *Id.* at *7.

[66] *See, e.g.*, *Emerson Radio*, 2011 WL 1135006, at *6 (awarding $125,000 for incremental benefits including a minimum number of independent directors and lower threshold for the independent review of related-party transactions); *Citrix*, 2001 WL 1131364, at *10 n.57 (awarding $140,000 and summarizing fee awards in therapeutic benefit cases falling in the low six-figure range); *see also Golden State Bancorp*, 2000 WL 62964, at *3 (noting that if the benefit conferred by litigation is "meager or speculative . . . the Court often discounts the fees accordingly").

In awarding a fee, the court must consider "whether the plaintiff can rightly receive all the credit for the benefit conferred or only a portion thereof."[67] Stan's demand was served in May 2025—well over a year after the plaintiffs' complaints were filed and as briefing on the motion to dismiss was concluding. Yet her counsel reports over 90 hours of pre-settlement time.[68] At the settlement hearing, plaintiffs' counsel argued that the demand augmented their case by putting "an extra level of pressure on the board to investigate."[69] Tactical leverage is not a cognizable benefit to the Company.

Under these circumstances, treating demand counsel identically to litigating counsel would turn *Sugarland* on its head. It would incentivize counsel to serve demands during active litigation only to generate settlement leverage. Having conferred no independent benefit on the Company, Stan's counsel is not entitled to a fee award.

### 3. The Secondary *Sugarland* Factors

The remaining *Sugarland* factors confirm that a minimal award to Elstein's and Montague's counsel is appropriate.[70]

---

[67] *In re Plains Res. Inc.*, 2005 WL 332811, at *3 (Del. Ch. Feb. 4, 2005); *see also Sugarland Indus.*, 420 A.2d at 151.

[68] *See* Aff. of H. Mondros (Dkt. 51).

[69] Settlement Hr'g Tr. 51.

[70] I do not question the standing and ability of counsel.

The litigation presented no true contingency risk. The Complaint had little prospect of surviving a Rule 23.1 motion to dismiss. The case offered a "ready-made settlement opportunity" and was brought "with an obvious and well-marked exit in sight."[71]

A lodestar cross-check confirms that a significantly reduced fee is warranted and shows that a quantum meruit approach is not. Elstein's and Montague's counsel report 786.75 hours from inception until the parties agreed to settle, resulting in a lodestar of $708,366.75.[72] Awarding a $100,000 fee yields a fractional multiplier of approximately 0.14x.

Where a lawsuit generates little corporate benefit, compensating counsel for disproportionate hours defies equity. Derivative suits are designed to benefit the corporation, but this action presented a negative value proposition. Rather than protecting the corporation the plaintiffs purported to represent, the lawsuit drained corporate resources and achieved trivial results. If compensating counsel for their

---

[71] *Emerson Radio*, 2011 WL 1135006, at *6.

[72] *See* Affs. of B. Bennett, E. Komlossy, G. Egleston, R. Ernst, and L. Paskowitz (Dkt. 51). In total, counsel report 966.8 hours to generate an aggregate lodestar of $863,713.

raw hours is inequitable, awarding a premium on those hours would grant a windfall and encourage the sort of strike suit litigation that Delaware law abhors.[73]

Thus, a fee and expense award of $100,000 is appropriate.

### 4. The Service Awards

Finally, Elstein and Stan each request a service award of $2,500. The awards—if granted—would be "paid out of the fees awarded to their counsel as compensation for the time and effort these stockholders devoted to this matter."[74] I decline to grant either award.

Delaware courts do not presumptively grant service awards to representative plaintiffs.[75] They may grant sizable awards to a plaintiff who expends a "significant amount of time, effort and expertise" that goes "well beyond that provided by a typical plaintiff."[76] And they may grant small awards to individuals who step up as representatives in litigation that meaningfully benefits a class or nominal defendant. Neither circumstance exists here.

---

[73] *See Solak v. Daniels*, 2025 WL 1913190, at *1 (Del. Ch. July 11, 2025) ("Delaware law abhors a strike suit, meaning an action intended to provoke a settlement payment to the plaintiff and her counsel rather than to redress a meaningful governance problem.").

[74] Settlement Br. 44-45.

[75] *See Raider v. Sunderland*, 2006 WL 75310, at *2 (Del. Ch. Jan. 4, 2006) (describing the "presumption against" granting service awards).

[76] *Id.* at *1-2.

**III.    CONCLUSION**

The settlement is approved as fair, reasonable, and adequate.  Counsel for Elstein and Montague are awarded a total of $100,000, inclusive of expenses.  Stan's counsel is awarded $0.  The request for service awards is denied.  IT IS SO ORDERED.

Sincerely yours,

*/s/ Lori W. Will*

Lori W. Will
Vice Chancellor